UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **CADEVILLE GAS STORAGE, LLC** | **CIVIL ACTION NO. 12-2768** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **15.35 ACRES OF LAND IN OUACHITA PARISH, LOUISIANA, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

**OPINION**

On October 26, 2012, Plaintiff Cadeville Gas Storage, LLC ("Cadeville") filed this taking action against landowners Melinda Harper Bonnette and Doyle Wayne Bonnette ("the Bonnettes"), pursuant to the eminent domain power conferred by the Natural Gas Act ("the Act"), 15 U.S.C. § 717f(h).

On January 15, 2013, the Court held a hearing on Cadeville's "Motion to Confirm Condemnation of Property Rights and for a Preliminary and Permanent Injunction Authorizing Immediate Entry" [Doc. No. 9]. The Bonnettes appeared at the hearing with counsel, but did not oppose the motion. Based on the evidence presented and the Bonnettes' lack of opposition, the Court granted the motion. [Doc. No. 18]. However, the issue of compensation for the taking was reserved for trial.

On September 16, 2013, Cadeville filed a Motion to Strike Expert Reports Produced In Violation Of Court Order ("Motion to Strike Expert Reports") [Doc. No. 38]. The Bonnettes filed an opposition to the Motion to Strike Expert Reports [Doc. No. 40], and Cadeville filed a reply memorandum [Doc. No. 43].

On September 24, 2013, Cadeville filed a Motion to Strike /Exclude Witnesses Not

Previously Disclosed [Doc. No. 44].

On September 27, 2013, the Court issued a minute entry [Doc. No. 47] notifying the parties that (1) it would defer ruling on the pending motions, (2) the Bonnettes would be permitted to introduce the reports and offer testimony from Lydia Holland and Amy Price Sawyer, and (3) the Bonnettes would be permitted to offer testimony from Gregory Scallon and Adam Richardson, subject to the pending objections. The Court further notified the parties that it would address the pending motions simultaneously with the issuance of its opinion.

The bench trial was held on October 2, 2013. Cadeville had pending eminent domain suits against several landowners. Given the overlapping nature of the evidence, the Court determined, in the interest of judicial economy, to hold a consolidated bench trial on all remaining cases.[1] On motion of the represented landowners, including the Bonnettes, trial was continued until the following week.

On October 4, 2013, Cadeville filed a Motion for Partial Summary Judgment [Doc. No. 52], arguing that the Bonnettes should be prohibited from collaterally attacking the federal and state orders involved in this dispute.

Trial continued on October 8-11, 2013.

During trial, on October 10, 2013, Cadeville orally re-urged its motion to exclude testimony or evidence constituting a collateral attack on the federal and state orders involved in this dispute. The Court granted the motion and re-urged motion [Doc. Nos. 52 & 57].

That same date, the Bonnettes also orally moved to amend or correct their testimony to

---

[1] The cases were not consolidated; the Court merely consolidated the evidence to avoid unnecessary and redundant presentations.

adopt the testimony of another landowner, Dennis Frith, that they should be compensated in a greater amount than the Bonnettes had requested. [Doc. No. 58]. The Court denied the motion, although the Bonnettes were permitted to make arguments regarding just compensation. [Doc. No. 59].

Following trial, counsel for Cadeville and the represented landowners made oral arguments to the Court. The Court took the case and all pending motions under advisement. The parties did not file supplemental briefs or evidence.

On October 11, 2013, pursuant to the oral motion and stipulation of the parties in this matter [Doc. No. 61], the Court signed and filed an "Amended Order Confirming Cadeville Gas Storage LLC's Right to Condemn Property Rights and Granting a Preliminary and Permanent Injunction Authorizing Immediate Entry" [Doc. No. 53].

Having reviewed and considered the parties' written and oral arguments, the Court DENIES Cadeville's pending motions [Doc. Nos. 38 & 44] and any outstanding objections by either party. In issuing this Opinion, the Court has considered the expert reports and witnesses presented by all parties.

The Court hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

**I.     FINDINGS OF FACT**

Cadeville is a natural gas company as defined by the Act, 15 U.S.C. § 717(a)(6). On August 10, 2010, the Federal Energy Regulatory Commission ("FERC") issued a Certificate of

Public Convenience and Necessity ("Certificate") authorizing Cadeville to construct and operate a natural gas storage facility in Ouachita Parish, Louisiana.

Pursuant to the Certificate, Cadeville sought certain permanent and exclusive subsurface storage rights under the Bonnettes' property for the purpose of storing gaseous and liquid hydrocarbons in the "James Zone, Reservoir A," in the Cadeville Field, Ouachita Parish, Louisiana. Attempts by Cadeville representatives to negotiate with the Bonnettes on compensation for the property rights at issue were unsuccessful.

On October 26, 2012, Cadeville filed this action. Cadeville took all steps and proceedings required by law necessary to initiate these proceedings as required by 15 U.S.C. § 717f(h) and Federal Rule of Civil Procedure 71.1.

In a March 9, 2010 Order, the Louisiana Commissioner of Conservation ("the Commissioner") found that "the available geological, engineering or other appropriate information establishes that [the Storage Reservoir] is fully depleted of the original commercially recoverable natural gas and condensate contents therein." [Doc. No. 1, Exh. 4, Order No. 356-E-16]. In that order, the Commissioner further found that the "storage and the methods . . . for the drilling of new wells to the James Zone, Reservoir A, . . . in connection with the injection, storage and withdrawal of natural gas from the James Zone Gas Storage Area are reasonable and adequate, and these operations and the . . . storage will not endanger lives or property." *Id.*

Bobby Raines ("Raines") testified on behalf of Cadeville. Raines has a degree in geology. After working eleven years in the oil and gas industry, he had an environmental consulting business from 1994 to 2013. Between 2008 and April 2013, he served as a consultant to Cardinal Gas Storage Partners ("Cardinal"). Since April 2013, he has served as Senior Vice-

President of Engineering and Operations for Cardinal. He is ultimately responsible for the day-to-day operations of gas storage in the Louisiana gas storage areas of Cadeville, Arcadia, and Winnsboro and also for a northern Mississippi gas storage area.

Raines testified that Cardinal operates two types of gas storage projects: salt dome and reservoir. In a reservoir storage project like that of Cadeville, gas is injected into depleted gas sands. In its original state, the Cadeville storage area was full of gas, but other companies produced that gas between approximately 1984 and 2002 until it was no longer commercially feasible. The production wells were then plugged and abandoned. Under the Commissioner's March 9, 2010 Order, the area has been found to be depleted of commercially recoverable gas.

Cadeville has completed the gas storage project, is taking gas from the Tiger and Centerpoint lines, injecting gas at the compressor station into the eight storage wells, and has had no problems. Cadeville was able to obtain 100% of the surface rights necessary to complete the project and does not seek to obtain surface ownership from the remaining landowners, including the Bonnettes. Cadeville was also able to obtain 98% of the subsurface rights necessary. The 2% of the subsurface rights remaining are those belonging to the property owners whose compensation rights were at issue at the consolidated trial, including those belonging to the Bonnettes.

Michael J. Veazey also testified on behalf of Cadeville. Veazey is a petroleum engineer with over 45 years of extensive experience in the oil and gas industry. The Court qualified Veazey as an expert in petroleum engineering based upon his knowledge, skill, experience, training, and education. The Court found his opinions to be reliable and relevant, particularly given his previous testimony before the Commissioner on this project.

Veazey testified that the James Zone, Reservoir A, in the Cadeville Field is depleted of all commercial hydrocarbons. Three wells formerly producing from the reservoir demonstrate the lack of commercial production. *See* Trial Exhibit 14. Further, the reservoir was even less commercial as a gas reservoir on the day of Veazey's testimony than the day of the hearing before the Commissioner because the price of natural gas on that day was $5.31/mcf[2], but had since declined to about $3.82/mcf. Veazey testified that the James Zone, Reservoir A, was the most depleted reservoir he had seen in his career.

Veazey also testified that the James Zone, Reservoir A, is suitable and feasible for use for the injection, storage, and withdrawal of natural gas. The reservoir has not leaked in 5 years, based on the fact that the measured pressure in 2004 was 90 psig,[3] and measured pressure in late 2009 was still 90 psig. Low and constant pressure in the reservoir over a long period of time proves the reservoir is a closed and sealed container with no remaining commercial oil or gas reserves. Based on these facts, Veazey believes the James Zone, Reservoir A, is an ideal candidate for gas storage.

Veazey testified that the James Zone, Reservoir A, will not contaminate other formations containing fresh water, gas, or other mineral deposits. Requirements set forth by the Commissioner will protect other horizons from potential contamination. Veazey explained that under the Commissioner's order, an operator could drill wells through the storage reservoir to a deeper horizon, but any operator doing so would have to comply with a casing program, which,

---

[2] Mcf is a measure of natural gas. One mcf equals 1,000 cubic feet of natural gas. *See* http://www.natgas.info/html/glossary.html

[3] Veazey defined "psig" as pounds per square inch.

among other requirements, requires the company to set a cement stage two hundred feet below the James Zone.  Operation of the gas storage facility will re-pressurize the reservoir.  With the Commissioner's requirements and the increased pressure, Veazey opined that drilling would be safer than it would be otherwise.

Additionally, Veazey testified that drilling requirements within and below the James Zone, Reservoir A,  are no more onerous, financially[4] or otherwise, than those a prudent operator would follow if drilling a well through any reservoir that has been pressure depleted to the extent of the James Zone.

Finally, Veazey testified that the storage facility will not endanger lives or property; the Field Rules adopted by the Louisiana Office of Conservation will protect the reservoir against pollution and the escape of natural gas.  Rules and regulations to which Cadeville will adhere are more rigorous than routine operations and their operations are no more hazardous than other types of oil and gas operations.  Veazey opined that he does not believe there is a possibility of a sink hole either.

Louis F. Gilbert ("Gilbert") testified on behalf of Cadeville.  Gilbert is a petroleum geologist with over 30 years of experience in the field.  The Court qualified Gilbert as an expert in petroleum geology and found Gilbert's opinions to be reliable and relevant.

Gilbert testified that he has three concerns with the suitability of a gas reservoir:  the ability to get gas in, the ability to get gas out, and that it does not leak.  He opined that the James Zone, Reservoir A was an "excellent candidate" for gas storage based on these criteria.  The

---

[4] Veazey referred to subsurface costs and acknowledged that he did not have knowledge of any effect on surface costs.

James Zone, Reservoir A has good space between the sandstone, i.e., porosity, and it has good permeability, which allows the fluid to flow through the formation. Gilbert agreed with Veazey's testimony that the James Zone, Reservoir A is closed based on the objective evidence that there was no increase in pressure over an extended period of time. Thus, the James Zone, Reservoir A will not leak.

Cadeville's operations in the reservoir will have no subsurface impact for wells drilled to depths above the reservoir. Cadeville's operations will have minimal subsurface impact to wells drilled deeper than (below) the reservoir, and aside from certain cementing requirements under the casing program designed to protect the reservoir, operators drilling wells through the reservoir would likely benefit from the re-pressurization of the reservoir. Gilbert testified that the operation of the reservoir will be no more burdensome on oil and gas exploration operations than drilling in areas with existing oil and gas infrastructure.

Finally, like Veazey, Gilbert testified that the James Zone, Reservoir A was depleted of commercial hydrocarbons. He described the James Zone, Reservoir A as severely depleted and testified that it was by percentage the most depleted reservoir he has encountered in 30 years.

Phillip Asprodites ("Asprodites") also testified on behalf of Cadeville.[5] Asprodites is an attorney who practiced oil and gas law for 16 years, which included the examination of mineral titles. Asprodites also served as the Commissioner of Conservation. Following his tenure as Commissioner, Asprodites has continued to practice law and is engaged in consulting, both with firms and as an expert witness. He has also continued to conduct mineral title examinations and

---

[5] Although Asprodites testified as a rebuttal witness, the Court finds it appropriate procedurally to address each of the relevant witnesses from Cadeville first.

issue title certificates. The Court qualified Asprodites as an expert in mineral title examination and Commissioner of Conservation practices. The Court found his opinions to be reliable and relevant.

Asprodites testified about the procedures necessary for the Commissioner to approve a gas storage project. He specifically testified that the Commissioner has the option of determining that there are native reserves which can be recoverable, but the utility of the gas storage is greater than the possibility of production. However, in this case, based on the evidence presented, the Commissioner determined that there were no economically recoverable mineral reserves within the gas storage area.

Asprodites further testified that this Court in its condemnation order could not give Cadeville greater rights than were permitted under the FERC order and the Commissioner's order. Thus, Asprodites opined that Cadeville did not receive surface rights to the subject properties condemned for the gas storage project.

Real estate appraiser James A. Young ("Young") testified on behalf of Cadeville. The Court qualified Young as an expert in real estate appraisal based upon his knowledge, skill, experience, training, and education. The Court found Young's opinions to be reliable and relevant.

Young testified as to the value of the property interests acquired. According to Young, the highest and best use of the property before the taking was residential and residential support (road), and that after the taking, there will be no effective change in the overall character or historical use of the property by reason of the Cadeville project. Accordingly, the highest and best use remains unchanged.

9

Young reached these conclusions by performing research on other similar locations to determine market reactions to subsurface natural gas storage facilities. Young identified similar storage projects near the Cadeville project: the Sawgrass Storage Facility, located around the community of Downsville (about 15 miles northwest of the Cadeville project); and the Unionville (West) Storage Facility and the Unionville (East) Storage Facility, both located around the community of Dubach (about 25 miles northwest of the Cadeville project).

Young found strong pricing similarities for similar home sites regardless of their location around Dubach, Downsville or Cadeville. Further, the markets appear very similar in all respects, including the ages and price ranges of homes.

Young then performed a "paired-sales analysis" in order to price differentials between sales of property located within the limits of the gas storage project and sales of property located outside the limits of the gas storage project boundaries. Young's research centered on property most similar to the subject ownerships in all the remaining cases in the consolidated trial; that is, small acreage tracts predominately for residential use. By analyzing land sales located within the Sawgrass and the Unionville Gas Storage projects and comparing them against land sales located just outside the gas storage projects, Young concluded that there was no effective difference in sales prices.

Finding no difference in market value between property located inside a gas storage facility and property located just outside a gas storage facility, Young testified that $100 per acre is just compensation for the property interests where there are no commercially recoverable minerals. Young recommended that the Court award a minimum of $1,500.00 for ownership of 10 acres or less, increasing by $100 per acre thereafter (e.g., for an eleven-acre tract, just

compensation would be $1,600.00). However, Cadeville admitted that Sawgrass paid as much as $800 per acre for gas storage rights to at least one landowner.

The parties stipulated to the testimony of certain other witnesses. First, Malcolm Maddox is employed by IberiaBank as the Executive Vice-President and Market President for Northeast Louisiana. Iberia provides banking services to customers in the area, including Ouachita Parish, and he is familiar with banking practices. If the Court's condemnation order were listed as an exception on a title insurance policy, so long as there was a notation in the exception that surface rights are not affected, this would not affect Iberia's mortgage lending group's willingness to lend/take a mortgage, so long as the loan application was otherwise acceptable. The Declarations/Stipulations filed in the public record in these matters would be sufficient to satisfy Iberia's mortgage lending underwriting requirements regarding no surface rights.

Second, Ronnie Darden is employed as President of Homeland Federal Savings Bank ("Homeland"). Homeland provides services to customers in the area, including Ouachita Parish, and he is familiar with banking practices. Homeland does residential mortgage lending, sometimes using only title opinions and sometimes utilizing title insurance. If the Court's condemnation order were listed as an exception in either a title opinion or title policy, but it was noted in the exception that surface rights were not affected, this would not affect Homeland's willingness to lend/take a mortgage, so long as an application was otherwise acceptable. The Declarations/Stipulations filed in the public record in these matters would be sufficient to satisfy Homeland regarding surface rights.

Third, James Mixon ("Mixon") is a Louisiana attorney with the firm of Mixon and Carroll and was admitted to the bar in 1979. He practices in the areas of mineral title

11

examination, real estate title examination, title insurance and banking. He is a title insurance agent for Westport Insurance Company and Commonwealth Land Title Insurance Company. Mixon routinely writes mineral title opinions, real estate title opinions and title insurance commitments and policies. He has written over 250 mineral title opinions. He writes approximately 100 title policies per year and he and his firm issue in excess of 400 real estate title opinions per year. Mixon also routinely advises banks regarding mortgage lending. He has reviewed the Order of the Court and the Declarations/Stipulations filed in the public record in these matters. If he were to list the Order as an exception in a title opinion or title commitment, the Declarations/Stipulations would be sufficient for him to make a notation on any such exception that surface rights are not affected.

The Court also heard testimony from witnesses presented by the Bonnettes. Melinda Bonnette testified about the property belonging to her and her husband. The Court found Mrs. Bonnette's testimony to be relevant and credible.

Mrs. Bonnette testified that they own a home located at 1745 Caples Road in West Monroe, Louisiana, and that the home and 15 acres of land were appraised for $615,000 by Aaron Boothe in July, 2013. Mrs. Bonnette further testified that she believes that Cadeville should pay her compensation of $615,000, the total appraised value of her property, because of her concerns about title and because of potential safety issues, such as sinkholes. Mrs. Bonnette did not apprise her appraiser of the condemnation proceeding, but did not know whether he knew generally of the Cadeville Gas Storage project. She admitted that he had considered the neighborhood and surrounding area in valuing the property.

The Court also heard testimony from Lydia Holland ("Holland"), an attorney who has

been in practice since 2004. She is engaged primarily in the practice of real estate law, performing title opinions, representing lenders in their attempts to obtain valid mortgages on property, and handling other real estate transactions. The Court recognized Holland as an expert in real estate title examination.

Holland testified that she was asked to perform a title examination by a lender for property owned by another landowner, Pamela Miller Strange. In conducting that examination, she reviewed the abstractor's report, which contained notations regarding an expropriation proceeding and a notice of lis pendens. The abstractor had attached the Court's original (January 13, 2013) condemnation order in favor of Cadeville to his report.

After reviewing the order, Holland was concerned that the order was broadly worded. She had two specific concerns: surface rights and mineral rights. In the section addressing Cadeville's permanent and exclusive subsurface storage rights, paragraph B states that Cadeville has the right "to do and perform all such other acts and things as may be necessary and or convenient as determined by Cadeville for the purposes outlined herein . . ." [Doc. No. 18]. Based on that language and her overall reading of the order, Holland was concerned whether Cadeville obtained surface rights on the property. Additionally, reading paragraphs C and E together, Holland was concerned whether Cadeville received all of the minerals underneath the property of every nature and every kind, rather than only those minerals contained in the storage reservoir. Based on her concerns, Holland could not assure her client, the lender, how Cadeville would use the property.

Holland was later asked to perform a title examination for other landowners, Tommy and Karen Kelley, but the lender withdrew its request after she issued a letter pointing out that she

13

would list the Court's order as an exception, given her concern that it would impinge on the Kelleys' ability to grant a properly secured mortgage to the lender. She also later issued an expert report for several of the landowners: Strange, Deborah and Jack Clampit, Amanda Clampit, and the Kelleys. Although Holland did not issue an expert report for the Bonnettes, the Court finds her opinions to be relevant to the instant case as well because the orders are identical.

However, during cross-examination, Holland agreed that if the Court did not have authority to grant surface rights, then its order could not have done so. Holland is a title examination lawyer, but is not a FERC or an oil and gas lawyer. In an attempt to address her concerns about the Court's order, she recommended to the lender she represented and to the realtors involved in the original transaction with Strange's property that they get an oil and gas lawyer to issue a written opinion on the Court's order and its effect on the property. While Holland did not concede that this opinion would have resolved all her concerns, she did agree that there were several ways to address her concerns, none of which were pursued prior to trial. She did not review the FERC order or the Commissioner's order or consider how those orders limited the Court's condemnation order because her job was to determine the risk to the lender; she had made that determination; and neither the lender nor the parties involved in the real estate transaction pursued further action to address the risk or concern.

## II.  CONCLUSIONS OF LAW

Under the takings clause of the Fifth Amendment of the U.S. Constitution, private property may not be taken for a public purpose without "just compensation." U.S. CONST. amend. V. Just compensation generally means the fair market value of the property when appropriated. *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 10 (1984). Courts have

repeatedly admonished that the landowner must be made whole, but is not entitled to more. *Olson v. United States*, 292 U.S. 246, 255 (1934).

"Market value" has further been defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1) Buyer and seller are typically motivated;

(2) Both parties are well informed or well advised, and acting in what they consider their own best interests;

(3) A reasonable time is allowed for exposure in the open market;

(4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

(5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

12 C.F.R. § 34.42(g).

When determining what some hypothetical willing buyer would give for the land, courts often look to actual, comparable sales on the open market between willing buyers and sellers. *See Kimball Laundry Co. v. United States*, 1949, 338 U.S. 1, 6; *United States v. Trout*, 386 F. 2d 216, 222-23 (5th Cir. 1967). What comparable land changes hands for on the market at about the time of taking is usually the best evidence of market value. *Baetijer v. United States*, 143 F. 2d 391, 397 (1st Cir. 1944).

In determining fair market value, courts must consider the highest and most profitable use

for which the property is adaptable and needed or likely to be needed in the reasonably near future. *Olson*, 292 U.S. at 255. Potential uses must overcome a presumption in favor of the existing use. A landowner can overcome this presumption only by showing a reasonable probability that the land is adaptable and needed for the potential use in the near future. If there is no reasonable probability that the property could be devoted to a suggested potential use, the court need not consider that use in determining the fair market value of the property. *United States v. 8.41 Acres of Land*, 680 F. 2d 388, 394-95 (5th Cir. 1982).

Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for ascertainment of value. *Olson*, 292 U.S. at 257.

Even if the landowner shows that a potential use is profitable and that the property is adaptable for that use, that use is not necessarily the measure of the value of the property. Instead, it is to be considered to the extent the prospect of demand for the use affects market value. *Olson*, 292 U.S. at 257.

At trial, the burden of establishing value rests with the owner of the condemned property. Whether the landowner has carried this burden is a question for the trier of fact. *United States ex rel. T.V.A. v. Powelson*, 319 U.S. 266 (1943).

If only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract. Such damage is often, though somewhat loosely, spoken of as severance damage. On the other hand, if the taking has in fact benefitted the remainder, the benefit may be offset against the value of

the land taken. *United States v. Miller*, 317 U.S. 369 (1943).

The Fifth Circuit has determined that Louisiana law controls when determining just compensation for takings under the Natural Gas Act. *See Miss. River Transmission Corp. v. Tabor*, 757 F. 2d 662, 665, n.3 (5th Cir. 1985).

The Louisiana Constitution provides that an owner of expropriated property "shall be compensated to the full extent of his loss . . . [including] the appraised value of the property and all costs of relocation, inconvenience, and any other damages actually incurred by the owner because of the expropriation." LA. CONST. art. 1, § 4.

Having heard all the testimony and considering the range paid as compensation, the Court finds that neither the Sawgrass figure nor the Young figure is appropriate in this case. The $800 per acre paid by Sawgrass is too great an amount, given the more onerous nature of the agreement in that case. On the other hand, Young's recommended figure of $100 per acre, with a minimum of $1,500.00 for 10 acres or less, is too low, failing to account for the great inconvenience to the landowners. Instead, the Court finds that $500 per acre with a minimum payment of $2,000.00 is just compensation for the property interests condemned and the inconvenience to the Bonnettes. Based on a total acreage of 15.35, the Court determines that the Bonnettes should be awarded $7,675.00 as just compensation for the taking of their property interests.

During trial, the Court granted Cadeville's motion to exclude any evidence or testimony collaterally attacking either the FERC order or the Commissioner's findings in Order No. 356-E-16. The Commissioner found that the James Zone, Reservoir A, is fully depleted of the original commercially recoverable natural gas and condensate contents. Further, the

17

Commissioner's findings are consistent with the expert testimony, which the Court has credited. Accordingly, the Court determines that the Bonnettes are not entitled to damages for the uneconomic minerals condemned by Cadeville.

The Court finds that the testimony of expert witnesses Michael Veazey and Louis Gilbert is credible with respect to the impact of the Cadeville Gas Storage Reservoir on minerals located above and below the James Zone, Reservoir A.  The Court determines that the Cadeville Gas Storage Reservoir will have no subsurface impact for wells drilled to depths above the reservoir, and drilling requirements for wells drilled to depths below the reservoir are no more onerous than those a prudent operator would follow if drilling a well through any reservoir that has been pressure depleted to the extent of the James Zone.  The Court further determines that the operation of the reservoir will be no more burdensome on oil and gas exploration operations than drilling in areas with existing oil and gas infrastructure.  Finally, the Court finds that the Bonnettes are not prevented from entering into mineral leases covering their property. Accordingly, the Bonnettes are not entitled to damages for "stranded minerals."

The Court finds that Cadeville's rights to the property were originally enumerated in the Order Confirming Cadeville Gas Storage LLC's Right to Condemn Property Rights and Granting a Preliminary and Permanent Injunction Authorizing Immediate Entry.  The original Order does not grant surface rights to Cadeville and does not award Cadeville any minerals or other natural resources other than those that are contained in the Storage Reservoir, as defined in the Order. Accordingly, Cadeville's rights do not constitute a cloud on the Bonnettes' title, nor do they prevent the future sale and/or encumbrance of the Bonnettes' property.  Further, to the extent that

a title examination lawyer might have raised concerns about the original order,[6] those concerns have been addressed both by the Declaration filed by Cadeville in the land records and by the stipulated-to Amended Order Confirming Cadeville Gas Storage LLC's Right to Condemn Property Rights and Granting a Preliminary and Permanent Injunction Authorizing Immediate Entry, which was signed by the Court.

### III. CONCLUSION

For the foregoing reasons, judgment is rendered in favor of the Bonnettes and against Cadeville in the total amount of $7,675.00.

MONROE, LOUISIANA, this 20th day of December, 2013.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

---

[6] The Court accepts Holland's testimony as credible and reliable, but she admitted that she lacked expertise in the areas of FERC and oil and gas law and with this particular issue. She raised a concern that the interested parties chose not to address with an attorney who does have expertise in the related areas. Thus, the Court credits the testimony of Asprodites, who is an expert in mineral title examinations and served as Commissioner of Conservation, that the Court's original Order does not grant surface rights or mineral rights, other than those contained within the reservoir.